IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NT SECURITIES, LLC, a Louisiana )
limited liability company; )
NT FUTURES, LLC, a North )
Carolina limited liability )
company; and NT FINANCIAL )
GROUP, LLC, a North Carolina )
limited liability company, )
                              )
         Plaintiffs, )
                              )
     v.                   )     No. 04 C 2284
                              )
MICHAEL W. TERYAZOS, an individual; )
ODIN NORTH, LLC, an entity of unknown )
origin; ODIN NORTH, INC., a Canadian )
corporation; KEITH MASSEY, an )
individual; EFG CORP. LTD., a )
Manitoba, Canada, corporation; )
PINNACLE CAPITAL MARKETS, INC., )
f/k/a Fairway Securities, Inc., )
an Ohio corporation; PINNACLE CAPITAL )
MARKETS, LLC, a North Carolina )
limited liability company; PINNACLE )
CAPITAL INTERNATIONAL, INC., an entity )
of unknown origin; DOES I through V; )
MICHAEL A. PACIOREK, an individual; )
and DAN A. GEORGE, an individual, )
                              )
         Defendants. )

## MEMORANDUM OPINION AND ORDER

      This case concerns employees/owners/members who left one
set of securities firms to form and/or work for another set of
securities firms. It is alleged that the former affiliates
improperly appropriated former customers, violated their
membership, employment, and other contracts, and committed
other improper acts, including fraud. Plaintiffs claim that

defendants' conduct violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and also constituted various torts in violation of state law. There is also a claim by one plaintiff against one defendant for copyright infringement. Jurisdiction in this case is based on federal question jurisdiction over the RICO and copyright claims and supplemental jurisdiction, see 28 U.S.C. § 1367, over the state law claims. There is also an allegation in the Amended Complaint that there is diversity jurisdiction "as to certain of the defendants, particularly the Canadian defendants, . . . who are foreign citizens." Am. Compl. ¶ 3. However, there is no diversity jurisdiction over the claims against the foreign citizens if there are also opposing parties in the case who are citizens of the same state. See 28 U.S.C. § 1332(a)(3); Tango Music, LLC v. DeadQuick Music, Inc., 348 F.3d 244, 245 (7th Cir. 2003); Karazanos v. Madison Two Associates, 147 F.3d 624, 626-27 (7th Cir. 1998); Indiana Gas Co. v. Home Insurance Co., 141 F.3d 314, 315-16 (7th Cir.), cert. denied, 525 U.S. 931 (1998). There are a number of parties for whom no citizenship is alleged, including limited liability companies for whom the citizenship of their members is not alleged. See Tango, 348 F.3d at 245; Belleville Catering Co. v. Champaign Market Place, L.L.C., 350 F.3d 691, 692-93 (7th Cir. 2003). Also, some of the corporations are alleged to have offices in a particular state or to be located in a particular state, but there is no allegation that each particular corporation has its principal

- 2 -

place of business in that state. See 28 U.S.C. § 1332(c)(1). On the allegations of the Amended Complaint, it is not shown that there is complete diversity of citizenship among the nonforeign parties. The only bases for jurisdiction that are supported by the Amended Complaint are federal question jurisdiction and supplemental jurisdiction.

Defendants have moved to compel arbitration as to most counts and for a stay as to the counts not subject to arbitration. Plaintiffs concede certain claims are subject to arbitration and, after a motion to compel arbitration was filed, initiated arbitration as to those claims. Plaintiffs oppose arbitration as to other claims and oppose staying any claims that are not subject to arbitration. Plaintiffs have moved for a preliminary injunction. Defendants contend that motion is moot because only one plaintiff would be entitled to claim such relief and that plaintiff is no longer in business. Even if not moot, defendants contend there is no sufficient basis for granting a preliminary injunction.[1]

Named as plaintiffs are NT Securities, LLC ("NTS"); NT Futures, LLC ("NTF"); and NT Financial Group, LLC ("NTFG").[2] NTFG allegedly owns NTS and NTF, but is not alleged to directly

_____

[1]Defendants' motion to file a "sur-sur-reply," otherwise known as a surrebuttal, will be granted. That brief has been considered.

[2]NTFG was formerly known as NovaTrade Securities, LLC. NovaTrade will also be referred to as NTFG.

engage in its own business. NTS is a registered Broker-Dealer and a member of the National Association of Securities Dealers ("NASD"). NTF is a registered Introducing Broker. NTFG and NTF are not members of the NASD.

Defendants Michael Teryazos and Keith Massey are alleged to be Canadian residents registered as Securities Brokers and registered with the NASD as Foreign Associates. Both are alleged to be former members of NTFG who signed Membership Interest Agreements. Plaintiffs name both Odin North, Inc. and Odin North, LLC as defendants (jointly "Odin North"), contending that they originally named Odin North, Inc., but that defendants contend the proper party would be Odin North, LLC. Odin North is alleged to be owned and/or operated by Teryazos and Odin North allegedly is an indirect owner of defendants Pinnacle Capital Markets, Inc. ("Pinnacle Inc.") and Pinnacle Capital International, Inc. ("Pinnacle Int'l"). Defendant Pinnacle Capital Markets, LLC ("Pinnacle LLC") allegedly is a direct owner of Pinnacle Inc.[3] It is alleged that Teryazos, Odin North, Pinnacle Int'l, and Michael Paciorek participated in organizing Pinnacle LLC for the purpose of acquiring the entity that would become Pinnacle Inc. Am. Compl. ¶ 64. It is not expressly alleged whether Paciorek's and Pinnacle Int'l's participation also involved having an ownership interest in Pinnacle LLC.

---

[3]Plaintiffs do not dispute defendants' representation that Pinnacle Inc. and Pinnacle LLC are NASD members.

- 4 -

Pinnacle Inc. allegedly is a registered Broker-Dealer. Defendant EFG Corp. Ltd. ("EFG Corp.") allegedly is a Canadian corporation owned and/or operated by Teryazos and Massey. Defendant Michael Paciorek is a United States resident who allegedly is a registered Securities Broker.[4] Paciorek allegedly was employed by NTF under an Employment Agreement and was a member of NTS under a Trading Agreement, but is now the President of Pinnacle Inc. Defendant Dan George is also a United States resident who allegedly is a registered Securities Broker.[5] He owned a Broker-Dealer entity[6] that was sold to NTFG and then renamed NTS. George is currently an owner of Pinnacle LLC.

According to the allegations of the Amended Complaint, the following facts are true. In November 2001, George sold NTS to NTFG. It is alleged that, through December 2002, George "remained closely affiliated" with NTS. Am. Compl. ¶ 31. During the first half of 2003, George discussed the possibility of purchasing an interest in NTFG and becoming a member. Ultimately, no such agreement was reached. Allegedly, the Mutual Confidentiality Agreement that was part of George's sale of NTS bound George to confidentiality provisions regarding the membership negotiations.

---

[4]Defendants do not dispute that Paciorek is an NASD associated person.

[5]Defendants do not dispute that George is an NASD associated person.

[6]This entity will also be referred to as NTS.

In the summer of 2001, Teryazos and Massey began discussions concerning a possible business relationship with NTFG, including being Foreign Associates for the purpose of marketing, to non-United States customers, the services of NTFG affiliates. In early 2002, NTFG's Operating Agreement was amended to reflect the ownership interests of Teryazos and Massey. On May 1, 2002, Teryazos and Massey executed Membership Interest Agreements with NTFG, which included that they would be bound by the NTFG Operating Agreement. They were Class A members. Paragraph 3.6 of the Operating Agreement contained restrictive covenants regarding non-interference with employees, independent contractors, and affiliates of NTFG. The restrictive covenants also included confidentiality provisions which prohibited disclosing or making use of _inter alia_ computer software or customer lists of NTFG and its affiliates. Plaintiffs also assert that, in the words of the Amended Complaint, ¶ 10.9 of the Operating Agreement provided that the Operating Agreement "superseded, _inter alia_, all prior agreements between the parties pertaining to their business relationships." Am. Compl. ¶ 40.[7] On October 5, 2003, Teryazos and Massey redeemed their membership interests in NTFG, but allegedly remained affiliated with NTS and NTF and continued to hold

---

[7]Defendants argue that the actual language of ¶ 10.9 is narrower than the construction asserted in the body of the Amended Complaint. Paragraph 10.9 is discussed below.

themselves out as loyal agents and representatives of NTFG and its affiliates.

In July 2002, Paciorek became an employee of NTF. He had an Employment Agreement that contained non-disclosure and non-competition provisions. In January 2003, Paciorek entered into a Trading Agreement with NTS and became a Class B member of NTS. The Trading Agreement contained a confidentiality provision. In February 2003, Paciorek became NTS's Manager and Chief Compliance Officer. In November 2003, he resigned from NTS and thereafter joined Pinnacle Inc.

It is asserted that, "as agents and/or partners in NTFG," Teryazos and Massey had a fiduciary relationship with NTFG and also its affiliates, NTS and NTF. Am. Compl. ¶ 55. It is asserted that, "by virtue of their various employment, contractual or other relationships with NTFG and its affiliates," George and Paciorek were fiduciaries of the three plaintiffs. Id. ¶ 56.

In February 2003, Teryazos and Massey allegedly began diverting business and customers of plaintiffs to themselves for their own profit. At least as early as August 2003, Paciorek allegedly joined in the scheme by aiding Teryazos in directly registering with the NASD, but without informing plaintiffs. It is conclusorily alleged that George aided and abetted this scheme, but no specific act is alleged other than being an owner of Pinnacle LLC. It is generally alleged that Teryazos and Massey made false representations when diverting income to

- 7 -

themselves and that they hid these transactions from plaintiffs. It is generally alleged that the mails, wires, and the Internet were used. It is also generally alleged that Teryazos and Massey deleted and/or copied confidential computer data and also took other forms of confidential information. No misrepresentation or omission is specifically alleged[8] nor is there any allegation of a specific mailing or use of the wires. The Pinnacle entities allegedly were formed, purchased, and/or reaffiliated in September 2003.[9] In December 2003, a large number of NTS accounts allegedly were transferred to Pinnacle Inc.

On the same day as the mass transfer of accounts, an unidentified NTFG manager telephoned Massey and questioned him about the transfers. In that conversation, Massey allegedly stated that he, Teryazos, and Paciorek possessed information that would be damaging to NTFG, its affiliates, and persons associated with them if disclosed to regulatory authorities. He threatened to disclose this information if NTFG or an affiliate were to pursue legal action against any of the three. After stating this threat, he again professed loyalty to NTFG. The next day,

___

[8]The only misrepresentation that is less generally alleged is that "On or about November 6, 2003, without advance notice, PACIOREK submitted his immediate resignation from [NTS], with statements to principals of NTFG and [NTS] that he intended to leave the securities industry." Am. Compl. ¶ 66(b). A week later, Paciorek registered his license with the NASD, informing it that he was with Pinnacle Inc. Id. ¶ 66(c).

[9]Pinnacle Inc. had a different name when purchased and was not renamed until December 2003.

- 8 -

Teryazos and Massey allegedly telephoned two unidentified principals of NTS and delivered similar threats.

By all being employees or owners of Pinnacle entities, the four individual defendants allegedly breached their promises regarding not interfering with employees or affiliates of plaintiffs.

The Amended Complaint contains 19 counts, denominated as follows: (I) NTFG's breach of contract claim against Teryazos for breaching the restrictive covenants of the Operating Agreement; (II) NTFG's breach of contract claim against Massey for breaching the restrictive covenants of the Operating Agreement; (III) NTFG's breach of contract claim against George for breaching the Mutual Confidentiality Agreement; (IV) NTF's breach of contract claim against Paciorek for breaching his Employment Agreement; (V) NTS's breach of contract claim against Paciorek for breaching his Trading Agreement; (VI) all plaintiffs claim the four individual defendants breached their fiduciary duties; (VII) by all plaintiffs against Teryazos, Massey, and Paciorek for destruction of personal property based on the destruction of electronic data and paperwork; (VIII) all plaintiffs claim the four individual defendants misappropriated trade secrets; (IX) by all plaintiffs against the four individual defendants for conversion; (X) NTS claims that, in November 2001, Pinnacle Inc. infringed NTS's copyright by duplicating the "Legal Notices: Terms of Use" pages of NTS's website on Pinnacle Inc.'s website; (XI) by all plaintiffs against the four individual

defendants for interference with contractual relations including NTS contracts with a securities clearing firm and software services firm, an NTF contract with a futures clearing firm, NTS customer accounts, and employee contracts (including Paciorek's contract[10]); (XII) by all plaintiffs against the four individual defendants for interference with prospective economic advantage; (XIII) by all plaintiffs against the four individual defendants for constructive fraud;[11] (XIV) by all plaintiffs against the four individual defendants for common law fraud; (XV) by all plaintiffs against all defendants for "raiding" based on "pre-planned, en-masse resignations of employees and associated persons from plaintiffs' offices to join" Pinnacle Inc., Am. Compl. ¶ 159; (XVI) by all plaintiffs against all defendants for a civil conspiracy "to accomplish the unlawful purpose(s) as alleged herein, namely to wrongfully obtain money and other property of and from, and otherwise injure, the plaintiffs," id. ¶ 165; (XVII) by all plaintiffs against all defendants for a RICO

---

[10]Paciorek himself is not claimed to have interfered with his own contract.

[11]"Constructive fraud is defined as 'any act, statement or omission which amounts to positive fraud or which is construed as a fraud by the courts because of its detrimental effect upon public interests and public or private confidence.' In re Estate of Neprozatis, 62 Ill. App. 3d 563, 378 N.E.2d 1345, 1349 (1st Dist. 1978). To state a claim for constructive fraud, Plaintiffs must 'allege facts establishing the breach of duty arising from a fiduciary or confidential relationship whereby the fiduciary has profited.' Hoopingarner v. Stenzel, 329 Ill. App. 3d 271, 768 N.E.2d 772, 778 (3d Dist. 2002)." Vega v. Contract Cleaning Maintenance, Inc., 2004 WL 2358274 *8 (N.D. Ill. Oct. 18, 2004).

conspiracy in violation of all subsections of 18 U.S.C. § 1962 involving predicate acts of mail fraud (id. § 1341), wire fraud (id. § 1343), extortion (id. § 1951), and Travel Act violations (id. § 1952), with the alleged enterprise being "PINNACLE, INC., its agents, officers and employees" or, alternatively, a group including all the defendants; (XVIII) by all plaintiffs against all defendants for equitable relief; and (XIX) by all plaintiffs against all defendants for an accounting.

As to all claims by NTS against Teryazos, Massey, Paciorek, George, Pinnacle Inc., and Pinnacle LLC, all of whom are NASD members, NTS has initiated an NASD arbitration. There is no dispute that those claims should be stayed pending arbitration. Counts V and X are entirely before the NASD. Counts VI, VII, VIII, IX, XI, XII, XIII, and XIV are before the NASD as brought by NTS, but not to the extent brought by plaintiffs NTFG and NTF. Counts XV, XVI, XVII, XVIII, and XIX are before the NASD as brought by NTS against the six defendants who are NASD members or associates, but not as to the claims brought by plaintiffs NTFG and NTF or as to the claims of NTS brought against non-NASD members Odin North, Pinnacle Int'l, and EFG Corp.

There is no contention that the Count I through IV breach of contract claims based on breaches of the NTFG Operating Agreement, George's Confidentiality Agreement, or Paciorek's NTF Employment Agreement are subject to arbitration. NTFG's and NTF's Count VII claims for destruction of property are not

claimed to be subject to arbitration. George does not contend
that there is any arbitration agreement that is applicable to
NTFG's and NTF's claims against him. As to all these claims,
defendants concede that this court is the appropriate forum,[12]
but contend that the appropriate procedure is to stay any action
until the other claims are resolved in arbitration.

As to Counts VI, VIII, IX, and XI through XIX, defendants
(other than George) contend that the claims of NTFG and NTF
contained in those counts and the claims of NTS against Odin
North, Pinnacle Int'l, and EFG Corp. are all subject to
arbitration under an October 31, 2001 Marketing Agreement (the
"Marketing Agreement") allegedly between NTFG and EFG Corp. and
applicable to NTFG's associates and affiliates as well.
Defendants contend this is the agreement under which Teryazos and
Massey became Foreign Associates of NTFG. It contains a broad
arbitration provision:

> In the event that any disagreement arises between
> the parties hereto with reference to this
> Agreement or any matter arising hereunder and
> upon which the parties cannot agree, then any
> such dispute shall be referred to arbitration in
> accordance with the provisions of the
> International Commercial Arbitration Act or other
> similar legislation in force in the State of
> Illinois.

---

[12]Regarding plaintiffs' motion for a preliminary
injunction, defendants do raise an issue as to whether the RICO
claims are a sufficient basis for the discretionary exercise of
supplemental jurisdiction over the state law claims. Defendants
do not move to dismiss the claims on that ground.

Plaintiffs do not dispute that, if enforceable against them and by defendants, this arbitration provision applies to at least some of the claims. Plaintiffs, however, contend that the Marketing Agreement was never executed or otherwise made binding upon them. Plaintiffs contend that the purported signature of an NTFG member that is on the Marketing Agreement is not authentic. They also contend that EFG Corp. was not a party to the Marketing Agreement and, even if it was, other defendants were not necessarily parties to the Marketing Agreement. Even if EFG Corp. and NTFG are parties and the Marketing Agreement was enforceable, plaintiffs contend it was superseded by the Operating Agreement which contains no arbitration provision. Plaintiffs contend disputed factual issues exist that would require a hearing to determine the enforceability and applicability of the arbitration clause. Defendants contend the signature on behalf of NTFG is authentic. Defendants concede that the party listed on the Marketing Agreement is EFG LLC,[13] not EFG Corp., but contend that this simply represents a decision to use a different name for the entity when it was renamed and authorities would not permit LLC in the name of a corporation. Even if the Marketing Agreement was not properly executed, defendants contend it is enforceable because the parties operated

[13]The body of the contract identifies EFG LLC as the party referred to in the contract as the "Agent." Each page of the contract, however, contains the caption "Marketing Agreement Between TSS LLC and NovaTrade Securities LLC." NovaTrade Securities LLC is the entity that was subsequently renamed NTFG.

under the contract, including NTFG and EFG Corp. entering into an agreement that states it "shall serve as a modification to the original Marketing Agreement." Defendants contend plaintiffs have not sufficiently raised any factual disputes that would require a hearing.

Whether the parties entered into the contract containing the arbitration provision is an issue for the court to resolve. See Sphere Drake Insurance Ltd. v. All American Insurance Co., 256 F.3d 587, 590-92 (7th Cir. 2000) ("Sphere Drake I"); Sphere Drake Insurance Ltd. v. All American Life Insurance Co., 221 F. Supp. 2d 874, 877-79 (N.D. Ill. 2002). This includes issues as to the authenticity of signatures, see Sphere Drake I, 256 F.3d at 590 (citing Chastain v. Robinson-Humphrey Co., 957 F.2d 851, (11th Cir. 1992)), and who was a party to the contract, see Sphere Drake I, 256 F.3d at 591. Also to the extent the contract was not executed or named the wrong parties, any issues as to whether the contract is otherwise enforceable based on subsequent conduct is for the court to decide in the first instance. See Chastain, 957 F.2d at 854. However, if the Marketing Agreement is found to have been enforceable and otherwise applicable to the claims, it is not as clear whether the Marketing Agreement being superseded by the Operating Agreement is an issue for the court or an arbitrator. See Matterhorn, Inc. v. NCR Corp., 763 F.2d 866, 872-73 (7th Cir. 1985). The parties, however, both make arguments regarding whether the Marketing Agreement was superseded, thereby indicating that they agree that this is an

- 14 -

issue for the court to resolve. To the extent this issue would fall within the arbitration clause, the parties have waived arbitration as to this issue. See Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc., 860 F.2d 1420, 1425 (7th Cir. 1988). See generally Cabintree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc., 50 F.3d 388, 390 (7th Cir. 1995). Compare First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995) (if parties submit issue of arbitrability to the arbitrator, that issue is to be decided by the arbitrator not the court even if the arbitration clause did not so provide).

Here, defendants have submitted a contract with an arbitration provision and the apparent signature of an NTFG member. In order to be entitled to a hearing as to whether that contract is enforceable as against NTFG and its affiliates, plaintiffs must present an "unequivocal denial that the agreement had been made" and produce some evidence to substantiate the denial. Chastain, 957 at 854-55 (quoting T & R Enterprises v. Continental Grain Co., 613 F.2d 1272, 1278 (5th Cir. 1980)); Drews Distributing, Inc. v. Silicon Gaming, Inc., 245 F.3d 347, 352 n.3 (4th Cir. 2001) (quoting Doctor's Associates, Inc. v. Stuart, 85 F.3d 975, 984 (2d Cir. 1996)); Great Western Mortgage Corp. v. Peacock, 110 F.3d 222, 231 n.36 (3d Cir.), cert. denied, 522 U.S. 915 (1997); Kreimer v. Delta Faucet Co., 2000 WL 962817 *6-7 (S.D. Ind. June 2, 2000) (quoting Interocean Shipping v. National Shipping & Trading Corp., 462 F.2d 673, 676 (2d Cir. 1972); Doctor's Associates, Inc. v. Jabush, 89 F.3d 109, 114

(2d Cir. 1996)). Cf. Livingston v. Associates Finance, Inc., 339
F.3d 553, 557 (7th Cir. 2003) (when opposing arbitration on
ground of prohibitive costs, party opposing arbitration must
present some evidence of prohibitive costs before the party
seeking to compel arbitration is required to come forward with
contrary evidence).

Defendants provide a contract dated October 31, 2001 and
titled "Marketing Agreement Between TSS LLC and NovaTrade
Securities LLC."[14] This document contains the previously quoted
arbitration clause. There is no dispute that, as of October
2001, NovaTrade was the name of NTFG. In the body of the
contract, NovaTrade[15] is identified as being the party to the
contract that will be referred to as the "Company." It is
provided that the Agreement is applicable to "any and all of the
associated companies owned or controlled by the Company."
Although TSS LLC is in the title of the Agreement, the body of
the Agreement states EFG LLC is the party to the contract that
will be referred to as the "Agent."[16] Unlike with the Company,
there is no provision making the contract applicable to

---

[14]Handwritten after NovaTrade Securities LLC is "/NT
Securities." Whether that was added before or after the
purported signature does not matter since NTS would otherwise be
a party to the contract as an affiliate of NTFG.

[15]NovaTrade will hereinafter be referred to as NTFG.

[16]Plaintiffs provide a copy of a purported prior draft in
which TSS LLC is also identified as the Agent in the body of the
contract. Apparently, the drafter failed to change the title
when changing the name of the Agent in the body.

- 16 -

affiliates of the Agent. On the line of the contract for an "Authorized Signatory" of the Company, there is a signature which is identified in printing as that of "Gary Brecka: Member." The Authorized Signatory line for the Agent is blank. The Marketing Agreement contains terms under which the Agent would pursue customers on behalf of the Company. It also contains terms as to payments and fees that the Agent would be entitled to receive.

Massey provides an affidavit stating that he and Teryazos negotiated with three NTFG representatives (John Logan, Larry Nocek, and Brecka) regarding introducing foreign retail clients to NTFG and its affiliates, including negotiating the terms of the Marketing Agreement. Massey states that a draft was submitted to NTFG, modifications were made and discussed, and that he eventually received from Brecka the version with the signature. Massey further explains that he and Teryazos owned a Canadian corporation named TheStockSheet.Com (TSS), but intended to rename it EFG ("Equities Futures Group") LLC. However, when an attempt was made to change the name, it was discovered that a corporation could not use LLC in its name, so the name EFG Corp. Ltd. was selected. In December 2001, he informed NTFG members of the name change. Plaintiffs do not deny that they were made aware that this was a corporate name used by Massey and Teryazos. Plaintiffs' own submissions support that no entity entitled EFG LLC was ever created. Also, plaintiffs do not deny signing another document identifying EFG Corp. as the Agent. Further, Teryazos and Massey naming and selecting the entity that is to be

bound by the Marketing Agreement is fully consistent with plaintiffs' allegation that "[u]nder the arrangement, TERYAZOS and MASSEY, directly or through a firm designated by them or either of them, would share in the commissions derived from securities and futures accounts introduced by them." Am. Compl. ¶ 35. With their "sur-sur-reply," defendants provide the affidavit of Teryazos containing further details of the negotiations and receipt of the signed Marketing Agreement. Teryazos also provides copies of emails related to the negotiations and explains that the copy with the signature was received via fax from London, where Brecka had said he was at the time.

Plaintiffs do not dispute that negotiations occurred regarding a written Marketing Agreement nor do they dispute that drafts were exchanged. However, Logan, Nocek, and Brecka all provide affidavits stating that no final agreement was ever reached. Brecka denies that the signature on the Marketing Agreement is actually his. Although not expressly stated, it is a reasonable inference that Brecka did not authorize someone else to sign on his behalf, though that is a possibility. Although, defendants' presentation provides strong support that an agreement was actually reached and that either Brecka or someone on his behalf signed the document, the three opposing affidavits are sufficient for a genuine factual dispute as to whether any member of NTFG signed the Marketing Agreement. <u>Cf.</u> <u>Johnson &</u>

Bell, Ltd. v. ASA Legal Systems, 2000 WL 139473 *4 (N.D. Ill.
Jan. 31, 2000).

Contrary to plaintiffs' contention, though, the lack of a
signature on the Marketing Agreement does not absolutely preclude
the Marketing Agreement from being enforceable. The Marketing
Agreement contains no language establishing as a condition
precedent that a signature was required to make the contract
enforceable. Cf. id. at *5. See also Ocean Atlantic Development
Corp. v. Willow Tree Farm, L.L.C., 2004 WL 526356 *7 (N.D. Ill.
March 17, 2004) (quoting Liu v. T & H Machine, Inc., 191 F.3d
790, 798 (7th Cir. 1999)) ("Illinois courts disfavor conditions
precedent and contracts will not be construed as having
conditions precedent unless required to do so by plain,
unambiguous language. . . . '[A] condition precedent must be
stated expressly and unambiguously.'"). Even if a signature was
a condition precedent, such a condition may be waived, either
expressly or implicitly by continued performance under the
contract or other conduct. See Continental Casualty Co. v.
Steelcase Inc., 2004 WL 1965699 *12 (N.D. Ill. Aug. 23, 2004);
Nevarez v. O'Connor Chevrolet, Inc., 303 F. Supp. 2d 927, 940
(N.D. Ill. 2004). It must be considered whether, by performance
or otherwise, the Marketing Agreement is enforceable as against
plaintiffs. See Restatement (Second) of Contracts § 30 (1981).
Cf. In re Vic Co., 227 F.3d 928, 930-32 (7th Cir. 2000).

It is undisputed that NTFG and EFG Corp. executed a
February 28, 2003, one-page document entitled "Terms and

- 19 -

Conditions."[17]  The 2003 Agreement expressly refers to the

"original Marketing Agreement" and states that the 2003 Agreement

is "written consent" to modification of the original Marketing

Agreement.  NTFG is referred to as the "Company" and it is

expressly noted in the agreement that NTFG was NovaTrade in the

original Marketing Agreement.  EFG Corp. is referred to as the

"Agent."  There is no express statement that EFG Corp. was

referred to as EFG LLC in the original Marketing Agreement.  The

2003 Agreement permits the Company to withhold certain fees due

the Agent under the original Marketing Agreement and instead pay

them over a period of time.  The 2003 Agreement also modifies the

original Marketing Agreement to increase the fees that the Agent

is entitled to receive for futures and commodities referrals.

     Plaintiffs do not point to any written document other

than the October 31, 2001 Marketing Agreement that the 2003

Agreement could be modifying.  Plaintiffs also do not contend

that fees being paid to defendants were other than as provided in

the Marketing Agreement.  Plaintiffs contend that the 2003

Agreement's references to a Marketing Agreement were simply

references to the unwritten arrangement that actually existed as

between Teryazos, Massey, and EFG Corp. and NTFG and its

affiliates.  That contention is not credible.  The repeated

references to the original Marketing Agreement are very specific,

---

[17]In their briefs, defendants refer to this document as
the "Modification Agreement."  In this opinion, it will be
referred to as the "2003 Agreement."

the parties are specifically referred to as Company and Agent, and the language about written modifications is consistent with having a written agreement that requires modifications in writing (as does the October 31, 2001 Marketing Agreement). It would be rather unusual to have an unwritten agreement that requires modifications be made in writing. The 2003 Agreement is strong evidence that, even if never signed, the parties, through their conduct, had accepted the October 31, 2001 Marketing Agreement. That the parties had accepted the Marketing Agreement is further evidenced by the fact that, in a letter dated February 5, 2004, NTFG sent written notice that the Marketing Agreement was being terminated. The termination notice is addressed to EFG, LLC and expressly refers to a Marketing Agreement "made and entered by and between" NTFG and EFG, LLC. Plaintiffs do not point to any Marketing Agreement referencing EFG LLC other than the October 31, 2001 agreement and this notice expressly acknowledges having "made and entered" into the agreement.[18] Additionally, defendants provide a November 15, 2001 e-mail from Brecka to Teryazos in which Brecka briefly responds regarding registration issues regarding Teryazos and Massey and then states: "This is all covered under our Marketing contract." Plaintiffs do not provide any evidence raising a sufficient factual dispute that a

---

[18]Even if plaintiffs were to contend that it was another draft of the Marketing Agreement that was actually accepted, each of the various drafts that are included in the parties' submissions contains the same arbitration provision.

Marketing Agreement containing the arbitration provision had not been accepted.

The evidence before the court only supports that the October 31, 2001 Marketing Agreement was the contract that existed between EFG Corp. and NTFG. This contract applies to NTFG affiliates NTS and NTF as well. The contract contains the broad arbitration provision quoted above. The 2003 Agreement modified the Marketing Agreement, but it did not modify the arbitration provision.

Plaintiffs' other contention is that the Marketing Agreement was superseded by Teryazos and Massey becoming members of NTFG and parties to NTFG's Operating Agreement. They became members in May 2002. The contention that the Marketing Agreement had been superseded in 2002 is in apparent conflict with NTFG modifying the Marketing Agreement in the 2003 Agreement and NTFG's 2004 notice terminating the Marketing Agreement. In any event, the Operating Agreement pertains to members' investment interests in NTFG, a North Carolina limited liability company. Plaintiffs do not point to any provisions in either the membership agreements or Operating Agreement that pertain to providing services to NTFG or paying fees for services rendered by a member. There is a provision prohibiting a member from having an employment or other relationship with an independent

contractor[19] of NTFG.  Excepted from that provision are
relationships entered into with the prior written consent of
NTFG, which the Marketing Agreement apparently would be.

Paragraph 10.9 of the Operating Agreement, upon which
plaintiffs rely, provides:  "This Agreement contains the complete
and entire agreement between the parties regarding the subject
matter hereof, and supersedes all prior negotiations, agreements,
representations and understanding, if any, between the parties
respecting such matters."  The plain language of this provision
is that it is limited to superseding prior agreements regarding
the same subject matter.  The Marketing Agreement regarding
provision of services and related fees for introducing foreign
customers concerns a different subject matter than the Operating
Agreement which pertains to members' investment and ownership
interest in NTFG.  The Operating Agreement does not supersede the
Marketing Agreement.

Still to be considered is the applicability of the
Marketing Agreement arbitration provision.  It is a broadly
written clause.  The parties disagree, however, regarding which
parties may invoke the arbitration provision.  Obviously, under
the terms of the Marketing Agreement, the arbitration clause
applies to the express parties to the contract, NTFG and its
affiliates (NTS and NTF) and EFG Corp.  Plaintiffs do not dispute

---

[19]The Marketing Agreement provides that EFG Corp. is an
independent contractor of NTFG.

that any agreement that existed was one that provided for the performance of services by Teryazos and Massey, the principals and/or agents of EFG Corp. Teryazos and Massey may invoke the arbitration provision of the Marketing Agreement. _Mississippi Fleet Card, L.L.C. v. Bilstat, Inc._, 175 F. Supp. 2d 894, 901 (S.D. Miss. 2001); _Hoffman v. Deloitte & Touche, LLP_, 143 F. Supp. 2d 995, 1004 (N.D. Ill. 2001); _Horizon Health Corp. v. Tyler-Holmes Memorial Hospital_, 284 F. Supp. 2d 439, 443 (N.D. Miss. 2003); _American Bureau of Shipping v. Tencara Shipyard S.P.A._, 170 F.3d 349, 353 (2d Cir. 1999). _See also Fyrnetics (Hong Kong) Ltd. v. Quantum Group, Inc._, 293 F.3d 1023, 1029 (7th Cir. 2002) (_dictum_ citing _Tencara_, _supra_). It is the applicability of the arbitration clause regarding the other defendants[20] that is primarily in dispute.

The Amended Complaint is not precise as to the various relationships and accounts. Apparently, however, it is alleged that, as Foreign Associates for NTF, Teryazos and Massey assigned customers to an account that had NTF as the Introducing Broker. That account was subsequently changed to identify EFG Corp. as the Introducing Broker. Separately, customers of NTS were switched to Pinnacle Inc. The three defendants clearly subject to the Marketing Agreement arbitration clause allegedly

---

[20]There is no dispute as to George. He does not seek to invoke the arbitration provision of the Marketing Agreement. He does agree that NTS's claims against him are subject to NASD arbitration.

misappropriated accounts by transferring the accounts to Pinnacle Inc. Pinnacle Inc. is indirectly, and possibly directly, owned (at least in part) by Teryazos and possibly Massey. Odin North and apparently Pinnacle LLC are, in part, entities through which Massey and Teryazos exercise control and apparently ownership over Pinnacle Inc. Pinnacle LLC is also a part owner of Pinnacle Inc. and apparently Pinnacle LLC is controlled, at least in part, by Teryazos and Massey. It is unclear whether Paciorek is alleged to be an owner of any of the entities or if he is simply an employee of Pinnacle Inc. who helped to organize it. Certainly, plaintiffs do allege that all defendants acted in concert, including that they were coconspirators.

Citing Hoffman, 143 F. Supp. 2d at 1005 (quoting MS Dealer Service Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1997)), defendants contend allegations of "substantially interdependent and concerted misconduct by both the nonsignatory [to a contract with an arbitration provision] and one or more of the signatories to the contract" are a sufficient basis for the nonsignatory invoking the arbitration provision based on equitable estoppel. If the rule was so simple, then clearly the nonsignatory coconspirators in this case could invoke arbitration since they are alleged to have acted in concert with EFG Corp., Teryazos, and Massey. However, "[a] plaintiff's allegations of collusive behavior between the signatory and nonsignatory parties to the contract do not automatically compel a court to order arbitration of all of the plaintiff's claims against the

nonsignatory defendant; rather, such allegations support an application of estoppel only when they "establish[ ] that [the] claims against [the nonsignatory are] intimately founded in and intertwined with the obligations imposed by the [contract containing the arbitration clause]." In re Humana Inc. Managed Care Litigation, 285 F.3d 971, 975 (11th Cir. 2002), rev'd on other grounds, PacifiCare Health Systems, Inc. v. Book, 538 U.S. 401 (2003)[21] (quoting MS Dealer, 177 F.3d at 948) (ellipses in Humana). See also JLM Industries, Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 177-78 (2d Cir. 2004) (a fact-specific inquiry depending on the particulars of the alleged intertwining). In Humana, the Eleventh Circuit pointed to the equity of not permitting a party "to have his cake and eat it too, that is, from 'rely[ing] on the contract when it works to [his] advantage [by establishing the claim], and repudiat[ing] it when it works to [his] disadvantage [by requiring arbitration]." Humana, 285 F.3d at 976 (quoting Tepper Realty Co. v. Mosaic Tile Co., 259 F. Supp. 688, 692 (S.D.N.Y. 1966)) (ellipses in Humana). According to the Eleventh Circuit, a "plaintiff's actual dependence on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the sine

---

[21]The issue and claims discussed in the Eleventh Circuit's Humana decision were distinct from the issue and claims that were before the Supreme Court in PacifiCare. The issue before the Supreme Court was one for which the Eleventh Circuit had adopted the opinion of the district court and did not discuss in Humana. See PacifiCare, 538 U.S. at 403; Humana, 285 F.3d at 973.

qua non of an appropriate situation for applying equitable estoppel." Humana, 285 F.3d at 976. Still, the Eleventh Circuit recognized that whether to apply equitable estoppel in these situations is within the discretion of the district court. Id. (quoting Grigson v. Creative Artists Agency, L.L.C., 210 F.3d 524, 528 (5th Cir.), cert. denied, 531 U.S. 1013 (2000)). In Humana, the Eleventh Circuit held the district court did not abuse its discretion when declining to compel arbitration of the claims against the nonsignatories because the RICO claims in that case were not based on the contract containing the arbitration provision. Humana, 285 F.3d at 976.

If Humana were to be applied literally, the nonsigna-tories in the present case could not compel arbitration. Plaintiffs are not trying to have their cake and eat it too, nor are their claims based on enforcing the Marketing Agreement. Plaintiffs contend the Marketing Agreement was not in force either as to the merits of their claims or regarding arbitration. Plaintiffs expressly base claims on violations of the NTFG Operating Agreement, George's Mutual Confidentiality Agreement, and Paciorek's Employment Agreement and Trading Agreement; they do not expressly rely upon the Marketing Agreement. Plaintiffs do, however, contend that a fiduciary relationship existed between plaintiffs and Teryazos and Massey and base their claims in part upon that alleged relationship. The Marketing Agreement would affect the terms of that alleged relationship, though plaintiffs do not rely on the Marketing Agreement itself.

The present situation is different from that in Humana. Here, although plaintiffs are not relying on the Marketing Agreement, the Marketing Agreement (including as amended by the 2003 Agreement) clearly will be raised as part of the defense to all or most of claims made by plaintiffs. The relationships between the parties that go to the merits of plaintiffs' claims cannot be determined without taking into consideration how the Marketing Agreement applies to those relationships. Defendants contend there was no improper misappropriation of customers or fees because the Marketing Agreement provided that "the Company recognizes that Prospects will be the property of the Agent . . . . The Company agrees to not solicit the Agent's Prospects for a period of twelve months should this Agreement ever become terminated." Marketing Agreement ¶ 24.[22] Defendants also contend that the alleged misappropriation of fees is actually the implementation of the modification of fees contained in the 2003 Agreement. Unlike Humana, although the Marketing Agreement is not relied upon by plaintiffs, it is certainly relied upon by defendants and central to the parties' dispute.

---

[22]Presumably, defendants will also rely on ¶ 7 of the Marketing Agreement which provides: "If any provision herein, or the application of any provision conflicts with, contravenes, contradicts or is inconsistent with or gives rise to any conflict with or contravention of the Memorandum or Articles of the Company or with any by-law of the Company or with any other agreement, then the provisions of this Agreement will prevail as between the Parties."

The present case is more like JLM than Humana. In JLM, plaintiffs contracted with non-party subsidiaries of defendants to have the subsidiaries ship chemical products. Standard form shipping contracts with the subsidiaries contained an arbitration provision. The JLM plaintiffs were not seeking to enforce the shipping contracts, but instead complained that the parent companies had violated antitrust laws by conspiring and otherwise acting together to improperly fix the charges for such shipments. See JLM, 387 F.3d at 167-68. Even though plaintiffs were not seeking to enforce the contracts, the claims were sufficiently related to the contracts and the parties' and nonparties' conduct sufficiently intertwined for the nonsignatory parents to invoke the arbitration provisions. Id. at 177-78. It is sufficient that the merits of the claims against the nonsignatories are "intertwined" with obligations contained in the contract containing the arbitration provision. Id. at 178; Denney v. BDO Seidman, L.L.P., ___ F.3d ___, 2005 WL 1389911 *9 (2d Cir. June 14, 2005). Here, as in JLM, although plaintiffs are not seeking to enforce the Marketing Agreement, the merits of plaintiffs' claims are "bound up with a contract binding one party and containing an arbitration clause." JLM, 387 F.3d at 177.

All the defendants are alleged to have acted together for common purposes and to have joined in a conspiracy. See Am. Compl. ¶¶ 64, 159, 165. Defendants are even alleged to have joined together in a single enterprise. See id. ¶ 172.

Allegedly misappropriated funds that would be a subject of the
Marketing Agreement arbitration between NTFG/NTF and
Teryazos/Massey/EFG Corp.[23] are alleged to have been diverted to
Pinnacle Inc. which is controlled and/or owned in whole or in
part by Teryazos and Massey. The claims against Pinnacle Inc.
are clearly intertwined with the claims against signatories
otherwise bound by the Marketing Agreement. Pinnacle LLC,
Pinnacle Int'l, and Odin North generally are not alleged to have
engaged in any specific activity other than being owned or
controlled by or owning or controlling Teryazos, Massey, or
Pinnacle Inc. These two individuals and the entities are
essentially treated as a single unit in the Amended Complaint.
Cf. JLM, 387 F.3d at 177. The Pinnacle and Odin North entities
are not alleged to have engaged in any misconduct independent of
the monies and accounts allegedly misappropriated by
Teryazos/Massey/EFG Corp.

    The intertwining is not limited to the facts of
misconduct. Obligations under the Marketing Agreement are also
intertwined with claims against these parties. The Marketing
Agreement contains specific provisions that the relationship
between Teryazos/Massey/EFG Corp. and plaintiffs is that of
independent contractor (¶ 17), as well as provisions regarding
use of confidential information (¶ 8) and solicitation of

---

[23]This would also include claims by NTS against non-NASD
member EFG Corp.

customers and ownership of accounts (¶ 24). The Marketing

Agreement, including the modifications contained in the 2003

Agreement, also contain provisions regarding fees that are

pertinent to whether certain fees were improperly diverted. If

Teryazos's, Massey's, and EFG Corp.'s transfer of accounts and

customers was permitted by the Marketing Agreement as they

contend, then there can be no successful claim against those

three defendants or the Pinnacle and Odin North entities. Since

this is true as to all claims for which these parties seek

arbitration, Teryazos's, Massey's, EFG Corp.'s, Pinnacle Inc.'s,

Pinnacle Int'l's, Pinnacle LLC's, and Odin North's motion to

compel arbitration under the Marketing Agreement will be granted.

Paciorek is the only defendant who might be treated

differently since he has his own relationships with plaintiffs

and some specific conduct on his part is alleged. He is still

alleged to be a central member of the conspiracy and his conduct

itself certainly is sufficiently intertwined with that of the

other defendants. As an individual, he obviously is not alleged

to have been owned by Teryazos, Massey, or EFG Corp. He is,

however, alleged to have acted as an agent of a company that

Teryazos and/or Massey substantially own or control, that is,

Paciorek is alleged to be the President of Pinnacle Inc.

Paciorek may also be alleged to be a part owner of Pinnacle Inc.

See Am. Compl. ¶ 64. It must be considered that, prior to his

November 2003 resignation, Paciorek was an employee of NTF and a

Member, Manager, and Chief Compliance Officer of NTS. Thus, he

had a relationship with plaintiffs that was independent of Teryazos/Massey/EFG Corp. and their Marketing Agreement. Although Paciorek had that distinct relationship, he is not alleged to have engaged in any misconduct purely for his own distinct benefit. All his alleged misconduct involves aiding Teryazos and Massey in diverting funds to them or the entities they control or own. Thus, all of Paciorek's alleged misconduct is intertwined with that of the signatories.

As to the claims against Paciorek being intertwined with obligations under the Marketing Agreement, it is true that the Marketing Agreement would not apply regarding the nature of Paciorek's relationship with NTFG or NTF. The Marketing Agreement also does not directly establish whether his employment and other relationships with plaintiffs permitted him to aid the other defendants in their endeavors. However, whether, as Compliance Officer, he improperly aided Teryazos and Massey in engaging in certain conduct may depend on whether that conduct violated Teryazos's and Massey's Marketing Agreement with plaintiffs. And most certainly, defenses based on the Marketing Agreement would be central to any possible damages against Paciorek. If, under the Marketing Agreement, certain NTF customers actually belonged to EFG Corp., Teryazos, and Massey and therefore were not improperly diverted, then possible damages against Paciorek could not be based on those customers being lost by NTF. Teryazos's, Massey's, and EFG Corp.'s obligations under the Marketing Agreement are sufficiently intertwined with the

claims against Paciorek to permit Paciorek to invoke the arbitration provision.

For the foregoing reasons, arbitration will be compelled (or continue to proceed) regarding all the claims for which defendants have requested arbitration. The only claims for which arbitration is not being compelled are claims I through IV, Claim VII as brought by NTFG and NTF, and the claims of NTFG and NTF against George. As to these claims, defendants request a stay while the arbitrations proceed. Whether to stay the nonarbitrable claims is within the district court's discretion. Pryner v. Tractor Supply Co., 109 F.3d 354, 361 (7th Cir.), cert. denied, 522 U.S. 912 (1997). Where the arbitrable claims predominate, it is appropriate to stay the nonarbitrable claims pending arbitration. Klay v. All Defendants, 389 F.3d 1191, 1204 (11th Cir. 2004), cert. denied, 125 S. Ct. 2523 (2005); McCarthy v. Azure, 22 F.3d 351, 361 n.15 (1st Cir. 1994). Here, every party will be arbitrating some or all of the claims in which he or it is named. The claims that are not being arbitrated are generally dependent upon the arbitrable claims in that their resolution will be affected by how the Marketing Agreement is construed and applied by the arbitrator. The nonarbitrable claims will be stayed. The stay will be effectuated by dismissing this case with leave to reinstate on timely notice and motion following the completion of both arbitrations, in order to enforce the arbitration award or reinstate any nonarbitrable claims that plaintiffs still desire

- 33 -

to pursue.[24]  See <u>Baltimore & Ohio Chicago Terminal R. Co. v.</u>
<u>Wisconsin Central Ltd.</u>, 154 F.3d 404, 407-08 (7th Cir. 1998),
<u>cert. denied</u>, 526 U.S. 1019 (1999).

Still to be considered is plaintiffs' motion for a
preliminary injunction. Plaintiffs contend they are entitled to
preliminary relief pending resolution of the arbitration. In
particular, it is argued that the NASD has rules regarding
seeking preliminary relief pending NASD arbitration. The parties
disagree as to whether certain procedural requirements for such
relief have been satisfied. Issues as to preliminary relief in
aid of the NASD arbitration need not be resolved. NTS is the
only plaintiff that is a party to the NASD arbitration. After
the motion for a preliminary injunction was filed and briefed,
NTS informed the court that it is no longer conducting business.
Since NTS is no longer conducting business, issues as to
injunctive relief are moot. NTS cannot be entitled to
preliminary relief. Therefore, any preliminary relief that is to
be granted would have to be based on a present effect on NTF.
NTFG does not itself directly engage in any securities
operations.

Arbitration under the Marketing Agreement will be in
accordance with Illinois's International Commercial Arbitration
Act ("ICAA"), 710 ILCS 30. The ICAA includes the following

---

[24]This procedure properly places the burden on the
parties and not the court to monitor the status of the
proceedings.

provision: "It is not incompatible with an arbitration agreement for a party to request, before or during arbitral proceedings, from a court an interim measure of protection and for a court to grant the measure." Such preliminary relief is also permitted under the Federal Arbitration Act, which is the Act under which defendants have moved to compel arbitration. See Gateway Eastern Ry. Co. v. Terminal R.R. Association of St. Louis, 35 F.3d 1134, 1141 (7th Cir. 1994) (quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano, 999 F.2d 211, 214 (7th Cir. 1993)); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cross, 1998 WL 122780 *3 (N.D. Ill. March 13, 1998). Any preliminary relief granted by the court, however, is temporary until the arbitrator has the opportunity to decide whether to grant preliminary relief. IDS Life Insurance Co. v. SunAmerica Life Insurance Co., 136 F.3d 537, 539-40 (7th Cir. 1998); Salvano, 999 F.2d at 215-16. In the present case, though, any preliminary relief that might be granted based on nonarbitrable claims that are otherwise being stayed might not be affected by any preliminary ruling of the arbitrator. Cf. IDS Life, 136 F.3d at 542 (preliminary relief as to codefendant who was not subject to arbitration is unaffected by any preliminary ruling of the arbitrator).

The same preliminary injunction standard applies as for the ordinary case not involving arbitration. See Salvano, 999 F.2d at 214; McBride v. St. Anthony Messenger Magazine, 2003 WL 1903381 *12 (S.D. Ind. Feb. 6, 2003). A "sliding scale approach" is applied.

A party seeking to obtain a preliminary injunction must demonstrate: (1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted. See Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 11 (7th Cir. 1992). If the court is satisfied that these three conditions have been met, then it must consider the irreparable harm that the non-moving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. See Storck USA, L.P. v. Farley Candy Co., 14 F.3d 311, 314 (7th Cir. 1994). Finally, the court must consider the public interest (non-parties) in denying or granting the injunction. Id. The court then weighs all of these factors, "sitting as would a chancellor in equity," when it decides whether to grant the injunction. Abbott Labs., 971 F.2d at 12. This process involves engaging in what we term the sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position. Id. The sliding scale approach is not mathematical in nature, rather "it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." Id.

Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 895-96 (7th Cir. 2001).

Plaintiffs do not contend they can be granted relief on their motion papers themselves. Instead, they request a preliminary injunction hearing, which defendants oppose. Plaintiffs do not provide any affidavits supporting their preliminary injunction motion, instead choosing to rely upon their verified Amended Complaint. While an unverified complaint will not by itself adequately support the need for a hearing,

Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal
Practice & Procedure § 2949 at 214 (2d ed. 1995), a verified
complaint may suffice, id. at 219. Still, plaintiffs are not
entitled to a hearing if the verified allegations are too vague
or conclusory to demonstrate a clear right to relief. See id.
at 215 (vague and conclusory affidavits are insufficient). Also,
if the facts adequately before the court are clearly insufficient
to support preliminary relief, the motion may be denied without a
hearing. See id. at 220-21, 225-26.

Defendants contend plaintiffs' verified Amended Complaint
is insufficient to support relief because it contains no
specifics regarding any customers that were misappropriated, the
existence of any trade secrets, nor the use of any trade secrets;
that were used. Defendants also contend that the contracts
relied upon are not shown to contain any non-competition
provisions. Defendants further contend that the allegations do
not support that plaintiffs would be irreparably harmed.
Additionally, defendants contend the RICO claim is so deficiently
pleaded that no sufficient basis would exist for retaining
supplemental jurisdiction over the state law claims and therefore
preliminary relief should not be considered.

The RICO claims must be alleged with the particularity
required by Fed. R. Civ. P. 9(b). Slaney v. The International
Amateur Athletic Federation, 244 F.3d 580, 587 (7th Cir.), cert.
denied, 534 U.S. 828 (2001). This includes alleging the
predicate acts with adequate specificity. Id. Clearly,

plaintiffs have not alleged their RICO claim with the specificity required by the Federal Rules of Civil Procedure.[25] Since the facts are insufficient to support a RICO claim, no basis exists for granting preliminary relief based on the RICO claim.

The court does not agree with defendants that a deficiency in pleading the RICO claim means the court should decline to consider preliminary relief based on the state law claims because dismissal of the RICO claim would leave no basis for exercising supplemental jurisdiction over the state law claims.[26] The RICO claim, however, is not being dismissed at the present time. It is inconsistent for defendants to contend that this court lacks jurisdiction to consider preliminary relief on the state law claims, but can exercise jurisdiction to compel arbitration of the state law claims. In any event, since the RICO claim is not actually being dismissed, the court will retain supplemental jurisdiction to consider possible preliminary relief.

In seeking preliminary relief, plaintiffs focus on defendants' alleged use of customer lists and diversion of customers. Although defendants contend there are no allegations of such diversions of NTF customers, it is expressly alleged

---

[25]This is a federal pleading issue only. No opinion is expressed as to the merits of the claim nor as to any pleading requirement that may be applied by the arbitrators.

[26]There is one other federal claim, the Count X copyright claim by NTS against Pinnacle. That claim is not sufficiently related to the other claims and parties to support supplemental jurisdiction over the other claims.

- 38 -

that, in February 2003, an account with NTF as the Introducing
Broker was changed to EFG Corp. as the Introducing Broker.[27]  Am.
Compl. ¶¶ 61-62.  It is alleged that Teryazos, Massey, and EFG
Corp. engaged in this conduct.  This is the only specific harm
regarding NTF.  The account itself is not specifically identified
nor is any specific customer identified.  There are also general
allegations about using customer lists and computer records, but
no particular document is identified.  The allegations of the
Amended Complaint, even though verified, are too general and
conclusory to require a hearing as to preliminary relief for harm
being presently suffered by NTF.  The facts do not adequately
support that NTF is presently being harmed nor do the alleged
facts adequately establish a proprietary interest in the
allegedly confidential trade secrets.  Plaintiffs have not
provided specific enough factual support to necessitate a
hearing.  The motion for a preliminary injunction will be denied.

IT IS THEREFORE ORDERED that defendants' motion to file a
sur-sur-reply [30] is granted.  Plaintiffs' motions for a
preliminary injunction [17, 46] are denied.  Defendants' motion
to compel arbitration and stay proceedings [10] is granted.  All
claims in this case are stayed pending resolution of related
arbitrations.  Plaintiffs' cause of action is dismissed without
prejudice, with leave to reinstate on timely notice and motion

---

[27]Also, regardless of whether there are any express
non-competition provisions in any of the contracts, there are
provisions regarding the use of customer lists and other
confidential information.

after an arbitration award is final, (a) to enforce an arbitration award or (b) to reinstate claims not resolved by arbitration. The court retains jurisdiction to consider confirming, vacating, or otherwise enforcing the related arbitration awards.

ENTER:

William T. Hort

UNITED STATES DISTRICT JUDGE

DATED: JULY     , 2005